UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CAPITAL IMPROVEMENT BOARD OF MANAGERS OF MARION COUNTY, INDIANA; MARION COUNTY CONVENTION & RECREATIONAL FACILITIES AUTHORITY (MCCRFA); and CIB BUILDING FACILITIES CORP., <br><br>Plaintiffs, <br><br>v. <br><br>AIG SPECIALTY INSURANCE COMPANY, <br><br>Defendant. | Case No. 1:22-cv-365 |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Capital Improvement Board of Managers of Marion County, Indiana, Marion County Convention & Recreational Facilities Authority, and CIB Building Facilities Corp. (collectively "CIB"), for their claims against AIG Specialty Insurance Company ("AIG"), allege and state as follows:

### I.   Introduction

1.   CIB owns and manages several facilities, including Gainbridge Fieldhouse[1] located at 125 S. Pennsylvania Street, Indianapolis, Indiana ("Fieldhouse"), and the Indiana Convention Center located 100 S. Capitol Avenue, Indianapolis, Indiana ("Convention Center"). CIB manages Lucas Oil Stadium located at 500 S. Capitol Avenue, Indianapolis, Indiana ("Lucas Oil Stadium"). Lucas Oil Stadium, the Fieldhouse, and the Convention

---

[1] Gainbridge Fieldhouse was known as "Bankers Life Fieldhouse" until it was renamed on or about September 27, 2021.

1

Center are sometimes collectively referred to as the "Insured Locations" and individually as an "Insured Location." The Insured Locations are all located in Marion County, Indiana.

2. Events scheduled for Lucas Oil Stadium, the Fieldhouse, and the Convention Center were not held as scheduled because of: (i) of the COVID-19 Pandemic; and (ii) Orders issued by the Governor of Indiana and the Marion County Public Health Department that closed the Insured Locations for these events. As a result, the CIB has lost considerable income and revenue. The CIB has also incurred significant expenses because of these issues.

3. CIB purchased commercial property insurance from AIG to cover these specific types of losses in the form of Policy No. 025032705 (the "CIB Policy"). *See* **Exhibit A** attached to this Complaint which is stated in its entirety in this paragraph. The CIB Policy became effective on August 1, 2019.

4. The CIB Policy contains endorsements, including Endorsement No. 8. Endorsement No. 8 provides coverage to the CIB for up to one million dollars ($1,000,000) for each Insured Location, if an Insured Location is closed, in whole or in part, by an order from a competent public authority in response to the existence or threat of hazardous conditions either actual or suspected at the Insured Locations.

5. AIG issued a Statement of Values for the Insured Locations ("Statement of Values"), a true and accurate copy of which is attached hereto as **Exhibit B**.

6. CIB has experienced losses falling within the coverages provided by Endorsement No. 8 of the CIB Policy.

7. CIB promptly made a claim for coverage of its losses under the CIB Policy.

8. Despite the fact that there is coverage under the Policy for losses incurred at the Insured Locations, AIG denied CIB's claims.

## II. Parties

9. Plaintiff, Capital Improvement Board of Managers of Marion County, Idiana, is a Municipal Corporation of the Consolidated City of Indianapolis, Marion County, Indiana.

10. Plaintiff, Marion County Convention & Recreational Facilities Authority ("MCCRFA"), is a Political Subdivision of the State of Indiana.

11. Plaintiff, CIB Building Facilities Corp, is an Indiana Nonprofit Corporation with its principal place of business located at 100 South Capitol Avenue, Indianapolis, Marion County, Indiana. CIB Building Facilities Corp does work through Capital Improvement Board of Managers of Marion County, IN, and MCCRFA.

12. CIB is authorized to finance, construct, equip, operate and maintain any capital facilities or improvements for general public benefit in the State of Indiana.

13. All Plaintiffs are Indiana citizens for jurisdictional purposes.

14. At all times material hereto, Defendant, AIG, was an Illinois corporation having a principal place of business in New York that was authorized to do business and issue insurance policies in the State of Indiana.

## III. Jurisdiction and Venue

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2). The parties are diverse in citizenship pursuant to 28 U.S.C. § 1332 and the amount in controversy, exclusive of interest and costs, is in excess of $75,000.

16. Venue is proper in this Court under 28 U.S.C. § 1391(a) and (b)(2) because at least one party resides within the district and because a substantial part of the events or omissions giving rise to these claims occurred in the Southern District of Indiana. Moreover, all parties conduct business here.

## IV. Factual Background

### A. COVID-19 as a Contagious Disease

17. COVID-19 along with its variants, also known as the "coronavirus," is a highly infectious, transmissible, and contagious disease that is uniquely resilient and deadly.

18. The coronavirus is a physical substance that can be present outside the human body in several forms, for example, in fluid droplets.

19. The World Health Organization ("WHO") has confirmed that COVID-19 can be transmitted from person to person by physical droplets in the air or on surfaces: "The disease can spread from person to person through small droplets from the nose or mouth which are spread when a person with COVID-19 coughs or exhales. These droplets land on objects and surfaces around the person. Other people then catch COVID-19 by touching these objects or surfaces, then touching their eyes, nose or mouth."

20. These droplets can travel over significant distances. On surfaces, they can remain detectable for several days.

21. COVID-19 particles have been transmitted by way of human contact with surfaces and items of physical property, spreading the COVID-19 disease. It has also been transmitted by human to human contact and interaction with premises, and by way of human contact with airborne COVID-19 particles present in the air.

22. A particular challenge with the coronavirus is that it is possible for a person to be infected with COVID-19, but be asymptomatic. Such seemingly healthy people unknowingly spread COVID-19 via speaking, breathing and touching objects.

23. The presence of COVID-19 particles can render items of physical property unsafe and the premises unsafe.

24. The presence of any COVID-19 particles causes direct physical harm to property, direct physical damage, and direct physical loss to property.

25. While infected droplets and particles carrying COVID-19 may not be visible to the naked eye, they are physical objects which travel to other physical objects and cause harm. Habitable surfaces on which COVID-19 has been shown to survive include, but are not limited to, stainless steel, plastic, wood, paper, glass, ceramic, cardboard and cloth.

26. The presence of people infected with COVID-19 and/or carrying the virus particles renders physical property in their vicinity potentially unsafe and unusable, resulting in actual and direct physical loss to that property.

### B.    The COVID-19 Spread and Civil Authority Orders

27. The first case of COVID-19 in Indiana was confirmed on March 6, 2020. On that same day Governor Holcomb, a competent public authority, issued an Executive Order 20-02 which stated among other things "that a public health disaster emergency exists in Indiana attributable to COVID-19."

28. On March 12, 2020, Governor Holcomb issued a press release that stated effective immediately there were to be no gatherings in excess of 250 people as a result of the existence or threat of hazardous conditions either actual or suspected at the Insured Locations.

29. On March 16, 2020, Governor Holcomb and the Marion County Public Health Department ("MCHD") both issued orders relating to COVID-19 and issued many other orders subsequent to that date. The orders described in paragraphs 21 and 22 above and Subsections **1.** and **2.** below of this Complaint are sometimes collectively referred to as the "Orders". A description of these Orders is set forth below.

30. As a result of the existence or threat of the hazardous conditions caused by COVID-19 and the Orders imposed by competent public authority, CIB was forced to close the Insured Locations, in whole or in part.

    a. **Executive Orders from Indiana Governor Eric Holcomb**

31. <u>Executive Order 20-04 dated March 16, 2020</u>. Indiana was ordered to continue to adhere to CDC guidance for large events and mass gatherings, which recommended no in-person events larger than 50 people.

32. <u>Executive Order 20-08 dated March 23, 2020.</u> This order required all non-essential businesses and "places of public amusement," to close. This order also expressly acknowledged the virus's "propensity to physically impact surfaces and personal property."

33. <u>Executive Order 20-17 dated April 3, 2020.</u> This order renewed all Executive Orders since March 6, 2020 for a period of 30 days (through May 6, 2020).

34. <u>Executive Order 20-18 dated April 6, 2020.</u> This order continued to prohibit non-essential businesses from being open. Public gatherings over 10 people were prohibited, and places of public amusement were ordered to close.

35. <u>Executive Order 20-22 dated April 20, 2020.</u> This order incorporated the provisions of Executive Order 20-18. This order continued to prohibit non-essential businesses and continued to limit public gatherings to 10 people.

36. <u>Executive Order 20-26 dated May 1, 2020 and entitled "Roadmap to Reopen Indiana."</u> This order extended Executive Order 20-22 through May 23, 2020. As of May 1, 2020 until at least May 3, 2020, all Indiana counties were designated Stage 1 and ordered to continue to adhere with Executive Order 20-22 (under which non-essential businesses were closed, and gatherings were limited to 10 people). Stage 2 was designated as May 4, 2020

through May 23, 2020, but did not include Marion County, which was to remain in Stage 1. Marion County was allowed to progress to Stage 2 on May 11, 2020. In Stage 2, the public gathering cap could increase to 25 people. This order also provided that "nothing in this Executive Order prohibits a county from imposing more stringent requirements than this Executive Order requires."

37. <u>Executive Order 20-28 dated May 21, 2020 and entitled "Back on Track: Reopening Indiana in Stage Three.</u> This order designated Stage 3 as May 22, 2020 through June 13, 2020. Stage 3 did not include Marion County, which was to remain in Stage 2, and subject to the restrictions in Executive Order 20-26 (under which non-essential businesses were closed, and gatherings were limited to 25 people). Marion County was allowed to progress to Stage 3 on June 1, 2020. In Stage 3, public gatherings in single-site venues were limited to 100 people. Venues with "multiple, clearly separate areas" were limited to 100 people per section or area. Multiple-site venues were required to ensure separate gatherings did not commingle, social distancing was in place, and restrooms were separated. Multi-day meetings or gatherings were strongly discouraged. This order also provided that "nothing in this Executive Order prohibits a county from imposing more stringent requirements than this Executive Order requires."

38. <u>Executive Order 20-32 dated June 11, 2020 and entitled "Back on Track Indiana: Stage Four."</u> This order allowed all counties to transition to Stage 4 and become subject to the provisions of this order. Stage 4 was designated as June 12, 2020 through July 3, 2020, and Stage 5 was scheduled to begin on July 4, 2020. Single-site venues and multiple-site venues had their public-gathering cap increased to 250 people. Multi-day meetings or gatherings remained strongly discouraged. This order also provided that "nothing in this Executive Order prohibits a county from imposing more stringent requirements than this Executive Order requires."

39. <u>Executive Order 20-35 dated July 1, 2020 and entitled "Back on Track Indiana: Stage 4.5"</u>. This order transitioned all counties except for Elkhart into Stage 4.5. Stage 4.5 was designated as July 3, 2020 through July 17, 2020. Conventions were allowed to resume, subject to Executive Order 20-32 (under which there was a 250 person limit per site or venue). This order also provided that "nothing in this Executive Order prohibits a county from imposing more stringent requirements than this Executive Order requires."

40. <u>Executive Order 20-36 dated July 16, 2020 and entitled "Back on Track Indiana: Stage 4.5"</u>. This order extended Stage 4.5 through July 31, 2020. Public gatherings and meetings remained limited to 250 people. Special or seasonal events[2] scheduled to occur on or after July 23, 2020 and where attendance was expected to exceed 250 people were required to have an event plan approved by the local health department, submitted 72 hours in advance. This order also provided that "nothing in this Executive Order prohibits a county from imposing more stringent requirements than this Executive Order requires."

41. <u>Executive Order 20-39 dated July 30, 2020.</u> This order extended Stage 4.5 through August 27, 2020.

42. <u>Executive Order 20-42 dated August 26, 2020 and entitled "Third Continuation of Stage 4.5 of Indiana's Back on Track"</u>. This order extended Stage 4.5 through September 25, 2020.

---

[2] Special or seasonal events were defined in the Order as "an assembly or convening of multiple people from separate households in a single space, indoors or outdoors, at the same time but where the main purpose is not necessarily for individuals to interact with others…but to attend a single event and/or events in a limited duration…such as concerts…conventions, sport or racing competitions, shows, or other entertainment events."

    b.    **Orders from the Marion County Public Health Department ("MCHD")**

42.    <u>MCHD Order 1-2020 dated March 16, 2020.</u>  This order prohibited public gatherings of more than 50 people and ordered all live performance venues and "similar indoor entertainment establishments" to close through April 6, 2020.

43.    <u>MCHD Order 2-2020 dated March 23, 2020.</u>  All businesses not identified as essential were ordered closed through April 6, 2020. The Insured Locations were not essential businesses.

44.    <u>MCHD Order 4-2020 dated April 1, 2020.</u>  This order confirmed that non-essential businesses were closed and were to remain closed through May 1, 2020. Public gatherings in excess of 50 people were still prohibited.

45.    <u>MCHD Order 5-20 dated April 30, 2020.</u>  This order reiterated that non-essential businesses were closed and were to remain closed through May 15, 2020. Public gatherings in excess of 50 people were still prohibited.

46.    <u>MCHD Order 9-20 dated May 13, 2020 and MCHD Order 10-20 dated May 15, 2020.</u>  These orders reiterated that non-essential businesses were closed and were to remain closed through June 1, 2020. The cap on public gatherings was decreased to 25 people.

47.    <u>MCHD Order 13-20 dated May 27, 2020.</u>  This order reiterated that non-essential businesses were closed and were to remain closed, effective June 1, 2020. The cap on public gatherings was increased back to 50 people.

48.    <u>MCHD Order 14-2020 dated May 28, 2020.</u>  This order reiterated that non-essential businesses (were closed and were to remain closed, effective June 1, 2020).

49.    <u>MCHD Order 16-20 dated June 11, 2020 and MCHD Order 17-20 dated June 12, 2020.</u>  In these orders, "cultural, entertainment, and tourism sites" were allowed to reopen at 50%

capacity indoors and 50% capacity outdoors. All staff of these sites were required to wear a face covering, and all patrons were recommended to wear a face covering. The cap on public gatherings increased to 250 people. These orders became effective June 19, 2020 and also provided that that "the restrictions imposed by Governor Holcomb's 'Stage 4' of the Back of Track Indiana Plan" applied to MCHD Order 16-20 and MCHD Order 17-20, "unless otherwise specified."

50. <u>MCHD Order 20-20 dated July 2, 2020.</u>  This order, effective July 9, 2020 at 8:00 a.m., required all individuals (excepting certain categories of individuals) to wear a face mask when indoors. All businesses and public accommodations were ordered to ensure their customers and visitors complied with this directive.  "Sports venues and raceway events" were allowed to resume at 50% spectator capacity, with consideration of social-distancing guidelines. Venues that anticipated more than 1,000 spectators were to create a risk mitigation plan in consultation with MCHD. "Cultural, entertainment, and tourism sites" were allowed to remain open at 50% capacity. "Conventions and conferences" were allowed to resume, subject to CDC guidelines and Governor Holcomb's executive order 20-32[3]. Conventions or conferences that anticipated more than 1,000 participants were to create a risk mitigation plan in consultation with MCHD. It should be noted that "the restrictions imposed by Governor Holcomb's 'Stage 4.5' of the Back of Track Indiana Plan" applied to MCHD Order 20-20, "unless otherwise specified."

51. <u>MCHD Order 21-20 dated July 23, 2020</u>.  This order reiterated the mask requirement for individuals when indoors (excepting certain categories of individuals). It also reiterated that businesses and public accommodations were to ensure their customers and visitors complied with this directive.  Effective July 27, 2020 at 8:00 a.m., "gathering[s], meeting[s], or

---

[3] Executive Order 20-32 limited venues to 250 people.

10

special or seasonal event[s][4]" were limited to 250 people or fewer, unless MCHD provided advance approval of a risk mitigation plan for an event that anticipated more than 250 attendees. The 250-person maximum applied to events, not facilities. Risk mitigation plans were to be submitted to MCHD at least 7 days before the event date, and had to address certain factors identified in paragraph 2(b) (iii) of Governor Holcomb's Executive Order 20-36. Effective July 24, 2020, "sports venues and raceway events" were allowed to remain open but had to decrease spectator capacity to 25% (versus 50% capacity from Order 20-20), and were encouraged to use electronic ticketing methods. Risk mitigation plans were now required when more than 250 spectators were expected (versus 1,000 spectators from Order 20-20). "Cultural, entertainment, and tourism sites" were allowed to remain open but had to restrict capacity to 25% (versus 50% capacity from Order 20-20). Conventions and conferences were allowed to take place, subject to CDC guidelines and Governor Holcomb's Executive Orders 20-32 and 20-36. Risk mitigation plans were now required when more than 250 participants were expected (versus 1,000 participants from Order 20-20). "The restrictions imposed by Governor Holcomb's Executive Orders 20-32, 20-35, and 20-36 applied to MCHD Order 21-20, "unless otherwise specified."

52.     <u>MCHD Order 22-20 dated July 27, 2020.</u>  This order reiterated the mask requirement for individuals when indoors (excepting certain categories of individuals). It also reiterated that businesses and public accommodations were to ensure their customers and visitors complied with this directive.  Effective July 27, 2020 at 8:00 a.m., "gathering[s], meeting[s], or special or seasonal event[s][5]" had the same restrictions on them as in Order 21-20 (250 people, or

---

[4] Special or seasonal events were defined in this order as "an assembly or convening of multiple people from separate households in a single space, indoors or outdoors, at the same time but where the purpose is <u>not</u> primarily to interact with the other attendees but to attend the event itself." Concerts, conventions, and sport competitions were identified as examples of special or seasonal events.

[5] Special or seasonal events continued to be defined as they were in Order 21-20.

larger with risk mitigation plan). Effective July 24, 2020, "sports venues and raceway events," "cultural entertainment and tourism sites," and conventions and conferences had the same restrictions on them as in Order 20-21, (25% capacity, or larger with risk mitigation plan). "Large facilities such as…convention centers" were allowed to have more than one event simultaneously as long as the events did not collectively exceed the 250 person-limit or 25% capacity. It should be noted that "the restrictions imposed by Governor Holcomb's Executive Orders 20-32, 20-35, and 20-36 applied to MCHD Order 22-20, "unless otherwise specified."

53.   <u>MCHD Order 25-20 dated August 11, 2020.</u>  This order reiterated the mask requirement for individuals when indoors (excepting certain categories of individuals). It also reiterated that businesses and public accommodations were to ensure their customers and visitors complied with this directive.  "Gathering[s], meeting[s], or special or seasonal event[s] "had the same restrictions on them as in Order 21-20 (250 people, or larger with risk mitigation plan)."Sports venues and raceway events," and "cultural entertainment and tourism sites" had the same restrictions on them as in Order 20-21, (25% capacity, or larger with risk mitigation plan). Conventions and conferences had the same restrictions on them as in Order 20-21 (subject to CDC guidelines and Governor Holcomb's Executive Orders 20-32 and 20-36). "Large facilities such as…convention centers" were still allowed to have more than one event simultaneously as long as the events did not collectively exceed the 250 person or 25% capacity (just as in Order 22-20).  It should be noted that "the restrictions imposed by Governor Holcomb's Executive Orders 20-32, 20-35, and 20-36 applied to MCHD Order 25-20, "unless otherwise specified."

54.   The Orders closed the Insured Locations for the purposes for which they were intended: sporting events, concerts, and conventions as a result of the existence or threat of hazardous conditions either actual or suspected at the Insured Locations. Because the Insured

Locations were closed, many events did not happen at the Insured Locations. As a result, the CIB has lost substantial revenue and income and incurred significant expenses.

55. The Orders' limitations on the number of persons who could be present at any venue or facility also closed the Insured Locations because the events that were scheduled had attendance figures that were well in excess of the allowable limits.

56. Even before Governor Holcomb's Executive Orders and the MCHP Orders were issued, events were cancelled at the Insured Locations due to the infectious and/or contagious disease manifested by people who would attend events at the Insured Locations. Specifically, this interruption of or interference with CIB's business causing business income loss was sustained because of COVID-19, including, but not limited to, the 2020 Big Ten Men's Basketball Tournament.

## V.   The CIB Policy Provisions

### A.   Business Interruption Coverage

57. The insuring agreement in the CIB Policy provides that AIG "insures against all risks of direct physical loss or damage to Insured Property from a **Covered Cause of Loss**[6]." Ex. A at 1.

58. The CIB Policy defines **Covered Cause of Loss** as "a peril or other type of loss, not otherwise excluded under [the CIB Policy]." Ex. A at 26.

59. The CIB Policy defines **Insured Locations** as real property "within the **Coverage Territory** described in the most recent Statement of Values," which includes Lucas Oil Stadium, the Fieldhouse, and the Convention Center. Ex. A at 30.

60. The CIB Policy "covers actual loss of income sustained by [CIB] during the necessary partial or total interruption of [CIB]'s business operations, services or production

---

[6] Terms in bold are bold in the original policy language, indicating that the term is defined in the policy.

during the Period of Interruption directly resulting from a **Covered Cause of Loss** to Insured Property at an **Insured Location**." Ex. A at 8.

61. The CIB Policy continues: "The actual loss of income sustained shall be determined by calculating the **Gross Earnings** and subtracting all charges and expenses which do not necessarily continue during the interruption of production or suspension of business operations or services." Ex. A at 8.

62. The events which did not occur at the Insured Locations because of COVID-19 and/or the closing of Insured Locations based on the Orders constitute a Covered Cause of Loss, pursuant to CIB Policy's Business Interruption coverage.

63. Because all of the events at the Insured Locations were cancelled due to a Covered Cause of Loss. CIB has been damaged and is entitled to recover all lost income and revenue which the CIB would have received had the events been held as scheduled.

B. <u>Endorsement No. 8</u>

64. Endorsement #008 to the Policy provides in its entirety as follows:

**ENDORSEMENT #008**

**This endorsement, effective 12:01 AM**, 08/01/2019
**Forms a part of Policy No.:** 025032705
**Issued to:** CAPITAL IMPROVEMENT BOARD OF MANAGERS OF MARION COUNTY, IN (CIB); MARION COUNTY CONVENTION & RECREATIONAL FACILITIES AUTHORITY (MCCRFA); CIB BUILDING FACILITIES CORP.
**By:** AIG SPECIALTY INSURANCE COMPANY

**SPECIAL PERILS BUSINESS INTERRUPTION AND EXTRA EXPENSE EXTENSION ENDORSEMENT**

This endorsement modifies insurance provided by the Policy:

**Special Perils Business Interruption and Extra Expense Extension**

The following shall be added to SECTION VI-ADDITIONAL COVERAGES:

The Company will pay actual Business Income loss sustained by the Insured and Extra Expense due to an interruption of or interference with the business of the Insured but only for such length of time as would be required with the exercise of due

    diligence and dispatch to restore the business to normal operating conditions in consequence of:

1. Infectious or contagious disease manifested by any person whilst on an Insured Location;

2. Injury or illness sustained by any person arising from or traceable to foreign or injurious matter of food and drink provided at Insured Locations or the threat thereof; or

3. Closing of the whole or part of the Insured Location by order of a competent public authority as a result of the existence or threat of hazardous conditions either actual or suspected at the Insured Location.

    The Company's total liability with respect to this coverage for any one Occurrence will not exceed the Sublimit of Liability of $1,000,000.

    All other terms and conditions of the Policy remain the same.

65. The Statement of Values provides certain dollar limits for each Insured Location. One such limit is "Business Income Limits – 24 Months" and such business income limits include debt services and operations.

66. The Business Income Limit (Operations) for the Convention Center is $42,030.876.

67. The Business Income Limit (Operations) for the Fieldhouse is $21,705,410.

68. The Business Income Limit (Operations) for Lucas Oil Stadium is $44,843,366.

69. The $1,000,000 sublimit of liability under Endorsement No. 8 applies separately to each Insured Location.

70. Because of the Orders, the CIB has incurred substantial loss of income and other revenue because these Orders closed events that were scheduled at the Insured Locations.

71. CIB is entitled to coverage under Endorsement No. 8 for the losses it has sustained because of the Orders.

## VI. CLAIM FOR DECLARATORY JUDGEMENT

72. Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as if fully stated in this paragraph.

73. The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to "declare the rights and other relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

74. Indiana's Uniform Declaratory Judgment Act similarly states:

> Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

Ind. Code § 34-14-1-2.

75. CIB has standing to bring an action for declaratory relief as to the proper interpretation under the CIB Policy because it has a direct interest in determining the rights and obligations owed by AIG to CIB under the CIB Policy.

76. An actual controversy exists concerning the parties' conflicting interpretations of the coverage provided by the CIB Policy.

77. Pursuant to the terms of the CIB Policy, AIG is obligated to pay, up to the limit of its respective liabilities, for all covered risks or property loss or damage, including and not limited to the loss or damage from canceled scheduled events at each of the Insured Locations due to COVID-19 and/or the Orders.

78. CIB's actual Business Income losses, costs and expenses sustained, as outlined above, are covered under the Special Perils Business Interruption and Extra Expense Extension provided in Endorsement No. 8 of the CIB Policy.

79. AIG has disputed its legal rights and obligations to pay CIB's claims, and has refused to pay CIB for any of its claims.

80. This Court should enter a declaratory judgment in favor of CIB and against AIG declaring that there is coverage available for CIB's claims up to the full limits or applicable sublimits of the CIB Policy and award any other just and proper relief.

## VII. CLAIM FOR BREACH OF CONTRACT

81. CIB repeats and re-alleges the allegations set forth in the preceding paragraphs as if fully stated in this paragraph.

82. The CIB Policy is a valid and enforceable contract between CIB and AIG.

83. In the CIB Policy, AIG agreed to cover property against all risks of physical loss or damage from peril or other types of loss, including and not limited to the loss and/or damage from canceled scheduled events at each of the Insured Locations due to COVID-19 and/or the Orders.

84. COVID-19 and/or the Orders are a peril or other type of loss as described in the CIB Policy.

85. CIB is entitled to coverage from the losses it has sustained because it has suffered damage covered in the CIB Policy's limit and/or applicable sublimits of liability.

86. CIB's losses and costs, as outlined above, are covered under Endorsement No. 8 in the CIB Policy and is not excluded.

87. CIB complied with all applicable provisions pursuant to the CIB Policy, including paying premiums and providing timely notice of its claim to AIG. CIB paid an additional premium for the inclusion of Endorsement No. 8.

88.  Nonetheless, AIG unjustifiably refuses to pay for CIB's claim, therefore breaching the CIB Policy.

89.  CIB has suffered and continues to suffer damages because of AIG's breach of the CIB Policy.

90.  CIB is entitled to damages because of AIG's breach in an amount to be determined at trial, including pre- and post-judgment interest and other cost and relief that this Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, CIB, by counsel, respectfully requests that this Court enter a declaratory judgment in favor of CIB and against AIG declaring that AIG is required to pay CIB for claimed amounts under the CIB Policy up to the applicable CIB Policy limits; enter judgment against AIG, awarding CIB damages in an amount to be determined at trial together with pre-and post-judgment interest; and award all other appropriate relief.

## JURY DEMAND

CIB demands a trial by jury on all claims so triable.

/s/ V. Samuel Laurin III
V. Samuel Laurin III, Attorney No. 11607-53
Curtis T. Jones, Attorney No. 24967-64
Luis D. Hernandez, Attorney No. 35798-49
Bose McKinney & Evans LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
(317) 684-5000; (317) 684-5173 (Fax)
slaurin@boselaw.com
cjones@boselaw.com
lhernandez@boselaw.com

*Counsel for Plaintiffs*

3994500v7